Thomas C. Newkirk (TN 7271)
James T. Coffman
Debra Patalkis (DP 0664)(Trial Counsel)
David Frohlich
L. Hilton Foster
Louis J. Gicale, Jr.
Christopher J. Chatfield

U.S. Securities and Exchange Commission
450 Fifth Street, NW
Mail Stop 9-11
Washington, D.C.  20549-0911
Tel.: (202) 942-7133 (Patalkis)
Fax: (202) 942-9569

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION, <br> PLAINTIFF, <br><br> v. <br><br> FIORE J. GALLUCCI, <br> RONALD A. MANZO, AND <br> GARY B. TAFFET, <br><br> DEFENDANTS. | CIVIL ACTION <br> NO. 04 CIV. 044932(SAS) |

## COMPLAINT

Plaintiff U.S. Securities and Exchange Commission (the "Commission") alleges:

## SUMMARY

1.     This is an insider trading case involving serial breaches of spousal duties of trust and confidence that resulted in an unlawful trading scheme yielding more than $3 million in ill-

gotten gains.    During 1998 and 1999, the defendants purchased, and tipped others who purchased, common stock or call options for the common stock of certain publicly traded companies on the basis of material, confidential, nonpublic information that these companies were targets of proposed but unannounced mergers or acquisitions.  Preceding each instance of unlawful trading, defendant Fiore J. Gallucci received information concerning the proposed business combinations in confidential conversations with his wife, who learned it in the course of her employment as secretary to a senior partner in the mergers and acquisitions practice at Skadden, Arps, Slate, Meagher and Flom ("Skadden").

2.      Gallucci misappropriated the inside information from his wife by disclosing it to his close friend, defendant Ronald A. Manzo, who in turn disclosed it to, among others, his friend and business associate, defendant Gary B. Taffet.  After receiving the inside information, Manzo and Taffet purchased and tipped others who purchased the subject securities.   The defendants' actions resulted in illegal trading profits of at least $3 million when the prices of the securities rose in response to the public announcements of the mergers or acquisitions.

3.      By engaging in the conduct set forth in this complaint, each defendant violated Sections 10(b) and 14(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b), 78n(e)] and Rules 10b-5 and 14e-3 [17 C.F.R. § 240.10b-5 and § 240.14e-3 promulgated thereunder, and unless enjoined, they will continue to engage in transactions, acts, practices, and courses of business similar to those alleged in this complaint.

4.      The Commission seeks injunctions against future violations, disgorgement of ill-gotten gains, prejudgment interest thereon, and statutory civil monetary penalties.

## JURISDICTION

5.     The Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

## THE DEFENDANTS

6.     Defendant Fiore J. Gallucci, age 62, resides in Staten Island, New York and at all relevant times was a bond salesman and vice president of a broker-dealer registered with the Commission.

7.     Defendant Ronald A. Manzo, age 60, resides in New Jersey and at all relevant times was president and owner of RAM Insurance Agency, a New Jersey-based insurance company that specialized in procuring insurance for local government entities in New Jersey.

8.     Defendant Gary B. Taffet, age 37, resides in New Jersey and at all relevant times owned Highview Planning LLC, a company that brokered insurance for local government entities in New Jersey.

## THE TARGET COMPANIES

9.     During the relevant period, the following companies were targets of proposed mergers or acquisitions that, when publicly announced, caused the prices of the target companies' securities and related call-option contracts to increase.  Skadden provided legal advice to a company involved in each of these business combinations.

10.     Digital Equipment Corp.   On January 26, 1998, Compaq Computer Corp. announced that it had agreed to buy Digital Equipment Corp. ("Digital") for $9.6 billion in cash

and stock, or about $60 per share. Compaq agreed to pay a 25 to 30 percent premium to acquire the company. Skadden represented Digital in the transaction.

11. <u>DSC Communications Corp.</u> On June 4, 1998, Alcatel Alsthom SA announced that it had agreed to buy DSC Communications Corp. ("DSC") for $3.98 billion in stock in a transaction that valued DSC at $31.84 a share, an 80 percent premium above DSC's previous closing price. Skadden represented Alcatel Alsthom SA in the transaction.

12. <u>Sundstrand Corp.</u> On February 22, 1999, United Technologies Corp. announced that it had agreed to buy Sundstrand Corp. ("Sunstrand") for approximately $4.3 billion in cash, stock, and assumed debt in a transaction that valued Sundstrand at approximately $70 per share, a 21 percent premium above Sundstrand's previous closing price of $58 per share. Skadden represented Sundstrand in the transaction.

13. <u>Chock Full O' Nuts Corp.</u> On April 22, 1999, Sara Lee Corp. announced its proposed tender offer for the outstanding shares of Chock Full O' Nuts Corp. ("Chock Full") for $10.50 per share, a 65 percent premium above Chock Full's previous closing price. Skadden represented Sara Lee Corp. in the transaction.

14. <u>Orion Capital Corp.</u> On July 12, 1999, Royal & Sun Alliance Insurance Group PLC announced that it had agreed to buy Orion Capital Corp. ("Orion") for $1.4 billion in a tender offer transaction that valued Orion at $50 per share, a 23 percent premium above Orion's previous closing price. Skadden represented Orion in the transaction.

4

15.    <u>Nielsen Media Research, Inc.</u>  On August 16, 1999, VNU NV announced that it had agreed to buy Nielsen Media Research, Inc. ("Nielsen") for $2.7 billion in cash and debt in a tender offer transaction that valued Nielsen at $37.75, a 15 percent premium above its previous closing price.  Skadden represented VNU NV in the transaction.

## Gallucci Learns the Names of the Target Companies

16.    At all material times, Gallucci and his wife resided in New York, New York.

17.    In October 1996, Gallucci's wife became employed as secretary to a senior partner in the mergers and acquisitions practice at Skadden's Manhattan office.  In the course of her work at Skadden, Gallucci's wife routinely learned material nonpublic, confidential information, including the names of publicly traded companies that were the targets of contemplated but unannounced mergers or acquisitions.  Galluci's wife knew that this information was material, nonpublic, and confidential.

18.    Beginning in or around 1998, at Gallucci's request, his wife disclosed to him highly confidential information that she had learned at Skadden, including the names of publicly traded companies that were the targets of unannounced merger or acquisition plans.  She disclosed this information to Gallucci after he expressly assured her that he would not disclose it to others or use it for trading purposes.  Gallucci knew this information was material, nonpublic, and confidential, and he knew that his wife had learned it in the course of her work as secretary to the head of Skadden's mergers and acquisitions department.

## Gallucci Tips Manzo

19.     Gallucci and Manzo have been friends for more than 20 years.

20.     Commencing in or around 1998, in violation of the duties of trust and confidence he owed to his wife, Gallucci started tipping Manzo about the identities of the companies targeted for acquisition in transactions in which Skadden was involved. From the onset, Gallucci told Manzo that the tips were based on information that he obtained from his wife, who had learned it in the course of her employment by an attorney who worked on mergers and acquisitions. Gallucci disclosed this information to Manzo with the knowledge and intent that Manzo would use it for trading purposes.

21.     Thereafter, Gallucci continued to tip Manzo, and Manzo continued to purchase securities of the target companies and to recommend them to others.

22.     Gallucci conveyed the tips in telephone calls from New York and in person, at Manzo's office in New Jersey.

23.     After Gallucci tipped Manzo, Manzo purchased the target companies' securities through several securities brokerage accounts, including: an account in the name of RAM Insurance Agency at Oscar Gruss Securities, Inc. in New York, New York; an account in his wife's name at Morgan Stanley Dean Witter, Inc. in New York, New York; an account in his name at FSC Securities, Inc. in Atlanta, Georgia; and an account in his wife's name at Scottsdale Securities, Inc. in Paramus, New Jersey.

24.    The prices of the target companies' securities increased in response to the public announcements of the proposed mergers or acquisitions.

25.    As illustrated by the following chart, Manzo's ill-gotten gains from his illegal trading totaled more than $980,000.

**Manzo's Insider Trading Profits**

| Account Name | Issuer | Public Announcement | Profits |
|---|---|---|---|
| Rose Manzo | Digital | January 26, 1998 | $   15,937 |
| Rose Manzo | DSC | June 4, 1998 | 131,043 |
| Rose Manzo | Orion | July 12, 1999 | 133,906 |
| Rose Manzo | Nielsen | August 16, 1999 | 153,437 |
| Ronald Manzo | Orion | July 12, 1999 | 4,781 |
| Ronald Manzo | Nielsen | August 16, 1999 | 7,937 |
| RAM Insurance | Sundstrand | February 22, 1999 | 115,875 |
| RAM Insurance | Chock Full | April 22, 1999 | 56,406 |
| RAM Insurance | Orion | July 12, 1999 | 174,312 |
| RAM Insurance | Nielsen | August 12, 1999 | 195,000 |
| **Total Profits** | | | **$988,634** |

26.    Gallucci tipped Manzo in order to increase his status with a more successful friend whom he had historically relied upon for financial and other assistance. During this time period, Manzo loaned Gallucci money and gave him several thousand dollars in cash.

## Manzo Tips Taffet and Others

27.    At all relevant times, Manzo and Taffet were business associates and friends. Manzo knew that Taffet, as president of Highview Financial, and as a person with strong political ties in New Jersey, was in a position to assist his company, RAM Insurance Agency, in obtaining insurance business from local government entities in New Jersey.

28.    Taffet knew or was reckless in not knowing that Manzo's information was material, nonpublic and provided in violation of duties of trust and confidence. Initially, Manzo tipped Taffet about the business combination plans of the Skadden clients described above without revealing the source of the information. Later, after Taffet had realized significant trading profits on the tips provided by Manzo on DSC and Chock Full, he asked Manzo to reveal the source of his recommendations. Manzo told him that he had a good friend who worked for an attorney that did mergers and acquisitions. After learning the source of Manzo's stock tips, Taffet continued to trade on tips from Manzo by purchasing common stock and call options, including near-term, out-of-the-money call options for the common stock of Nielsen and Orion, and also pressed Manzo to provide more inside information.

29.   Manzo also tipped two other individuals who purchased the securities of certain target companies for total profits of more than $7,000.

## Taffet Purchases Target Companies' Securities

30.    During the relevant period, Taffet maintained a securities brokerage account in his name at Prime Charter in Manhattan. Taffet also controlled a second account at Prime Charter in the name of his business, Highview Planning.

31.    During 1998 and 1999, after receiving the tips from Manzo described above, and prior to the public announcements of the proposed mergers or acquisitions involving the target companies, Taffet purchased common stock, or call options for the common stock, of the target companies. The prices of these securities increased in response to the public announcements of

the proposed mergers or acquisitions.  As illustrated by the following chart, Taffet realized profits of more than $240,000.

### Taffet's Profits

| Account Name | Issuer | Public Announcement | Profits |
|---|---|---|---|
| Gary Taffet | DSC | June 4, 1998 | $ 39,468 |
| Gary Taffet | Chock Full | April 22, 1999 | 5,250 |
| Gary Taffet | Orion | July 12, 1999 | 96,227 |
| Highview | Orion | July 12, 1999 | 4,471 |
| Gary Taffet | Nielsen | August 16, 1999 | 90,425 |
| Highview | Nielsen | August 16, 1999 | 11,618 |
| **Total Profits** | | | **$247,459** |

## Taffet's Tippees Purchase Target Company Securities

32.     During 1999, after receiving the tips from Manzo described above, Taffet recommended target company securities to five individuals based on material, nonpublic, and confidential information he received from Manzo.  These five individuals traded certain of the target companies' securities for total profits of more than $280,000.  At least one of those individuals also tipped two other individuals who traded certain of the target companies' securities for total profits of more than $1.549 million.  All of these trades occurred prior to the public announcements of the business combinations.

## VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT [I5 U.S.C. § 78j(b)] AND RULE 10b-5 [17 C.F.R. § 240.10b-5]

33.     Paragraphs 1 through 32 are realleged and incorporated herein by reference.

34.     At all relevant times, defendant Gallucci knew that the information he possessed concerning the proposed but unannounced business combinations, which had been conveyed to

him by his wife, was material, confidential, and nonpublic.   In breach of the duty of trust and confidence that he owed to his wife, Gallucci disclosed this information to defendant Manzo, as set forth above, with the understanding that Manzo would use the information for trading purposes.

35.   At all relevant times, defendant Manzo knew that the information he possessed concerning the proposed but unannounced business combinations was material, nonpublic, and confidential, and had been conveyed to him by Gallucci through misappropriation or in breach of a duty of trust and confidence.   While in possession of this material, nonpublic, and confidential, information, Manzo purchased, common stock, or call options of the target companies as alleged above.   When Manzo tipped others as alleged above, he knew or was reckless in not knowing that his tippees would both trade in the securities and recommend them to others.

36.   Taffet, knew, or was reckless in not knowing, that the information he possessed concerning the proposed but unannounced business combination plans, as described above, was material, nonpublic, and confidential, and had been conveyed to him by Manzo, directly or indirectly through misappropriation or in breach of a duty of trust and confidence.   While in possession of this material, nonpublic, and confidential, information, Taffet purchased common stock, or call options for the common stock, of the target companies as set forth above.   When Taffet tipped others as alleged above, he knew or was reckless in not knowing that his tippees would both trade in the securities and recommend them to others.

37.   By reason of the foregoing, defendants Gallucci, Manzo, and Taffet each violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## VIOLATIONS OF SECTION 14(e) OF THE EXCHANGE ACT [I5 U.S.C. § 78n(e)] AND RULE 14e-3 [17 C.F.R. § 240.14e-3]

38.   Paragraphs 1 through 36 are realleged and incorporated herein by reference.

39.   Prior to the public announcements of the tender offers for Chock Full, Orion, and Nielsen, and after a substantial step or steps to commence the tender offers for Chock Full, Orion, and Nielsen had been taken, defendant Gallucci, while in possession of material information relating to such tender offers, and while knowing that said information had been disclosed to him, directly or indirectly by a person acting on behalf of the offering person or the issuer of the securities sought or to be sought by the tender offers, directly or indirectly, engaged in fraudulent, deceptive, or manipulative acts or practices in connection with the tender offers by causing Manzo to purchase common stock, or call options for the common stock, of the issuers of the securities sought or to be sought by such tender offers, as described more fully above.

40.   On or before April 22, 1999, after Sara Lee Corp. had taken a substantial step or steps to commence a tender offer for the common stock of Chock Full, defendant Manzo, directly or indirectly, engaged in fraudulent, deceptive, or manipulative acts or practices in connection with the tender offer by purchasing or causing to be purchased, common stock, or call options for the common stock, of Chock Full while in possession of material, nonpublic information relating to the tender offer, which information he knew or had reason to know was

11

nonpublic and had been acquired, directly or indirectly, from Skadden or another person acting on behalf of Sara Lee Corp., as more fully described above.

41.     On or before July 12, 1999, after Royal & Sun Alliance Insurance Group PLC had taken a substantial step or steps to commence a tender offer for the common stock of Orion, defendants Manzo and Taffet, directly or indirectly, engaged in fraudulent, deceptive, or manipulative acts or practices in connection with the tender offer by purchasing or causing to be purchased, common stock, or call options for the common stock, of Orion while in possession of material, nonpublic information relating to the tender offer, which information each of them knew or had reason to know was nonpublic and had been acquired, directly or indirectly, from Skadden or another person acting on behalf of Orion, as more fully described above.

42.     On or before August 16, 1999, after VNU NV had taken a substantial step or steps to commence a tender offer for the common stock of Nielsen, defendants Manzo and Taffet, directly or indirectly, engaged in fraudulent, deceptive, or manipulative acts or practices in connection with the tender offer by purchasing or causing to be purchased, common stock, or call options for the common stock, of Nielsen while in possession of material, nonpublic information relating to the tender offer, which information each of them knew or had reason to know was nonpublic and had been acquired, directly or indirectly, from Skadden or another person acting on behalf of VNU NV, as more fully described above.

43.     By reason of the foregoing, defendants Gallucci, Manzo, and Taffet each directly or indirectly violated Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

(a)   permanently restrain and enjoin defendants Gallucci, Manzo, and Taffet and their agents, servants, employees, attorneys, and assigns and those persons in active concert or participation with them, and each of them, from violating Section 10(b) of the Exchange Act and Rule 10b-5 thereunder;

(b)   permanently restrain and enjoin defendants Gallucci, Manzo, and Taffet and their agents, servants, employees, attorneys, and assigns and those persons in active concert or participation with them, and each of them, from violating Section 14(e) of the Exchange Act and Rule 14e-3 thereunder;

(c)   order defendants Gallucci, Manzo, and Taffet to disgorge jointly and severally the ill-gotten gains derived from the unlawful trading alleged herein, including without limitation the trading profits of their tippees, plus prejudgment interest thereon;

(d)   order defendants Gallucci, Manzo, and Taffet to pay civil penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1]; and

(e)   grant such other relief as the Court deems just and proper.

Dated: June 16, 2004

                                    Respectfully submitted,

                                      _____

                                      Thomas C. Newkirk (TN7271)
                                      Debra Patalkis (DP 0664) [Trial Counsel]
                                      U.S. SECURITIES AND
                                      EXCHANGE COMMISSION
                                          450 Fifth Street, NW
                                          Washington, DC 20549
                                            Tel.(202)942-7133(Patalkis)
                                    Fax (202) 942-9569  (Patalkis)

Of Counsel:
James T. Coffman
David Frohlich
L. Hilton Foster
Louis J. Gicale, Jr.
Christopher J. Chatfield

(e)   grant such other relief as the Court deems just and proper.

Dated: June 16, 2004

Respectfully submitted,

Thomas C. Newkirk (TN7271)
Debra Patalkis (DP 0664) [Trial Counsel] ·
U.S. SECURITIES AND
EXCHANGE COMMISSION
450 Fifth Street, NW
Washington, DC 20549
Tel.(202)942-7133(Patalkis)
Fax (202) 942-9569  (Patalkis)

Of Counsel:
James T. Coffman
David Frohlich
L. Hilton Foster
Louis J. Gicale, Jr.
Christopher J. Chatfield

14